UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF ) 
ADVANCED PAIN CENTERS POPLAR ) 
BLUFF, ABDUL NAUSHAD, M.D., ) 
P.C., a/k/a ADVANCED PAIN ) 
CENTERS, a Missouri Professional ) 
Corporation, et al., ) 
                          )      Case No. 4:13CV01408AGF
           Petitioners, ) 
                          )      and
    v. ) 
                          )      Case No. 1:13CV00107 AGF
TIMOTHY WARE AND OTHER ) 
UNKNOWN FEDERAL AGENTS, ) 
                          ) 
           Respondents. ) 

## MEMORANDUM AND ORDER

Petitioners Adbul Naushad, M.D. P.C., also known as Advanced Pain Centers

("APC"), and Billy Jo Ann Wilmert brought this action under Rule 41[1] of the Federal

Rules of Criminal Procedure against Respondents Timothy Ware and other unknown

federal agents ("the Government") seeking to exclude as evidence, or obtain the return of,

certain seized documents and objects. This matter was originally filed as six separate

civil actions. Petitioners styled their initial filing in each case as a "Motion Pursuant to

---

[1]      Rule 41 of the Federal Rules of Criminal Procedure was reorganized in 2002, at which time the provision related to the return of seized property, Rule 41(e), was re-designated as Rule 41(g). No substantive change was made to the Rule. Following this re-designation, courts have applied case law relating to former Rule 41(e) to the current Rule 41(g). *See United States v. Garza*, 486 F. App'x 782, 784 n.3 (11th Cir. 2012); *Bennett v. United States*, No. 12–61499–CIV, 2013 WL 3821625, at * 8 n.5 (S.D. Fla. 2013); *see also* 3A Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice & Procedure: Criminal § 690 (4th ed. 2004) (explaining that "[c]ourts recognize that case law interpreting former Rule 41(e) generally applies to current Rule 41(g)").

Federal Rule of Civil Procedure 41 to Quash Search Warrants, Subpoenas, And/Or To Return Property Seized During the Course of the Execution of an Illegal Search." On Petitioners' motion, the cases were transferred to the undersigned and consolidated, with the three Southeastern Division cases consolidated into Case No. 1:13CV00107 AGF, and the three Eastern Division cases consolidated into Case No. 4:13CV01408 AGF.

The Court promptly held a conference with counsel, at which a procedure for addressing matters Petitioners identified as needing immediate attention was discussed. At the outset, the parties agreed to address, immediately, certain time-sensitive issues related to the seized documents, with the understanding that an evidentiary hearing on Petitioners' more comprehensive request for relief under Rule 41 would be conducted at a later date.

Consistent with the procedures discussed at the conference, Petitioners filed a Motion for a Temporary Restraining Order ("TRO") on July 22, 2013, seeking, in part, the immediate return of all items seized, including patient files, personal property, and documents claimed to be protected by the attorney-client and work product privileges, and a prompt hearing was set on dates agreed to by the parties. Although Petitioners filed the motion for TRO only in the consolidated Southeastern Division cases (Case No. 1:13CV00107 AGF), the issues raised and documents covered pertained to all six cases and search warrants. During the pendency of the motion for TRO, the Government permitted Petitioners to inspect and obtain copies of certain of the seized patient files that Petitioners asserted they needed immediately for patient treatment.

On July 22, 2013, the Court conducted a hearing on the motion for TRO. On July

23, 2013, the Court issued an Order granting in part and denying in part the TRO. *See* Doc. No. 10, Case No. 1:13CV00107 AGF. In that ruling, the Court refused to order the Government to return the seized patient files, based in part on the finding that Petitioners had not met their burden to demonstrate either that Defendants' actions were unlawful under the Fourth Amendment or that Petitioners were likely to succeed on the merits. The Court did require the Government to provide Petitioners with a redacted version of the sealed affidavit in support of the search warrant.[2] *See id.* Defendants were also ordered to make files available to Petitioners for copying by Petitioners' copy service on a set schedule, and to file an affidavit regarding when the Government first began making arrangements for its own copying service. The Court further advised Petitioners that it would entertain a motion to recover some or all of their copying costs, and set a schedule for filing a motion and briefing regarding the costs.

The Court withheld any ruling with respect to the attorney-client and work product issues pending the parties' briefing of those issues and further proceedings. In connection with the documents claimed as privileged, the parties agreed to a procedure that involved the use of a Taint Team and Chinese Wall process, such that only

---

[2] Petitioners also sought the return of certain personal property seized at the time of the search. By the date of the hearing, much of that property has been returned and Petitioners agreed that only "the Andrassen File," a personal file belonging to a physician employed at one of the APC clinics, remained at issue. The Court ordered the parties to attempt, in good faith, to resolve any dispute with respect to the return of the documents from the Andrassen File and to present to the Court any dispute they were unable to resolve. *See* Doc. No. 10. As of the date of this Order, the parties have not informed the Court of any remaining dispute with respect to the Andrassen File. The Court assumes that the parties successfully resolved that issue because they have presented nothing further regarding this issue.

Government attorneys who would have no involvement in the prosecution would review the documents at issue.

The Court also set a date for an evidentiary hearing on Petitioners' broader Rule 41 Motion. Prior to the date scheduled however, Petitioners advised the Court that they did not wish to present any further issues other than their request for return of the documents claimed as privileged. On September 17, 2013, the Court heard argument with respect to the privilege issues.

The sole remaining issues currently before the Court for determination are Petitioners' claim that certain designated documents claimed as privileged should be returned, and Petitioners' motion to recover the costs of copying seized patient files. For the reasons set forth below, Petitioners' request for return of the seized documents on the ground of privilege shall be denied, and Petitioners' motion to recover copying costs shall be granted in part and denied in part.

## I. **Background**

Petitioner Adbul Naushad, M.D. ("Dr. Naushad") owns and operates several APCs in the Saint Louis vicinity and in Southeastern Missouri. On June 26, 2013, a team of federal agents, task force officers, and state investigators, including local police and agents from the Department of Health and Human Services and the Missouri Board of Healing Arts, executed search warrants at six of the APCs.

The Patient Files

At the time of the search, the respondent federal agents seized approximately 800 APC patient files. There is no dispute that Petitioners had a need to access the APC

patient files, which contain imaging and other health information records, in order to treat patients and to obtain payment for the services provided. In preparing to execute the search warrants and conduct its investigation, the Government recognized that Petitioners would need to access seized documents, in particular patient files, and the search warrants described how Petitioners could inspect and obtain copies of the seized documents.[3]

In their initial Rule 41 Motions, Petitioners moved for the return of the original copies of the patient files claiming that they had been seized improperly. Petitioners also asserted that at a minimum, the Government should be required to provide copies of the files as they were necessary to the conduct of APC's business, and without the files Petitioners would be unable to treat APC patients. *See* Doc. No. 1. After some dispute regarding the manner in which copies would be made, the parties agreed that the Government would provide copies of the patient files to Petitioners, giving priority to the files of 137 patients who had upcoming appointments at the APCs. Initially, the Government copied the files and provided the copies to Petitioners. The Government was unable, however, to provide Petitioners with the requested patient files in a

---

[3]    The search warrants notified Petitioners that they could access and copy the seized documents at their own expense, as follows:

> DR. NAUSHAD, or someone he designates, may contact DEA Task force Officer Tim Ware . . . to request access to the seized documents and to have all or some of the documents copied at APC's expense. If APC requests portions of one or a few patient files, the files will be copied and provided at no cost. Patients will be provided copies of their files at no cost to them.

*See, e.g.,* Search Warrant, Attach. B, at p. 4.

sufficiently prompt manner prior to the patients' scheduled appointments. When the Court requested that the Government accelerate its copying process, the Government professed that it was unable to provide the copies more quickly because it did not have an approved contract with a copying service to perform the copying on the Government's behalf. The Court therefore instructed both parties to cooperate to accelerate the copying process. Petitioners arranged for their own copy service and the parties agreed to the manner in which the copying would be performed. Due to the slow pace of the copying up to that point, Petitioners had to arrange to have some of the patient files copied on an expedited basis.

The Government thereafter continued to allow Petitioners access to all seized patient files and delivered batches of patient files to the copy service Petitioners had arranged. In order to protect sensitive health information contained in the patient files and to reduce the likelihood of unauthorized access to or disclosure of protected health information, every effort was made to avoid leaving patient files overnight with the copy service. After Petitioners advised the Court that the copy service was able to handle a larger number of files in each daily batch, the Government increased the number of files released on a daily basis for copying.

Although not required to do so, the Government elected to scan some of the seized documents for ease of use during the investigation and any subsequent prosecution. Government counsel advised Petitioners that the Government intended to scan the seized documents and would provide Petitioners a copy of a disc containing the scanned files. Government counsel further advised Petitioners that she did not know how long it would

take to complete the scanning.  The Government's process for securing a printing and scanning contractor took longer than originally anticipated, but the record indicates that the delays were outside of Government counsel's control.[4]  On August 9, 2013, the Government notified Petitioners' counsel that the scanning had been completed and that he could obtain the disc containing a copy of the scanned files.

The original patient files are, and have been available for inspection and copying by Petitioners at the offices of the United States Department of Justice in the City of St. Louis.  Dr. Naushad and his wife, who also has an ownership interest in, and is involved in the day to day management of the clinics, reside in St. Louis County, Missouri. Petitioners' attorneys also have their offices in St. Louis County.  The six clinics that are the subjects of the search warrant are between 36 and 200 miles from St. Louis; three of the clinics are located within 70 miles of the City.  Dr. Naushad regularly works at the Advanced Pain Clinic in Festus, Missouri, which is about 36 miles from St. Louis.

The Files Claimed to be Privileged

During the search of the Festus APC, the Government also seized a binder containing 564 documents labeled "Patient Complaints" and "Incident Reports" ("the

---

[4]    As directed by the Court, the Government submitted an affidavit from the DEA Chief of Office Services.  *See* Affidavit of DEA Chief of Office Services, Doc. No. 15 p.3.  In the affidavit, the DEA Chief of Office Services avers that the delay in completing the scanning of the files was largely due to implementation of a new procedure related to protecting individually identifiable health information.  *See id*. at 4.  The DEA Chief described the various steps in the process, which includes the submission of a requisition form and a statement of work (SOW) by the field office, approval of the funding request, submission of a printing requisition to the Public Printer, submission of the SOW and requisitions to the Government Printing Office, preparation of a Request for a Quote to receive bids from approved GPO printing contractors, and the award of the contract.  *See id*. at 4-5.

Festus Binder"). The Government subsequently *Bates*-stamped these documents, which are numbered 1 through 564. Petitioners have reviewed the Festus Binder and assert no claim of privilege with respect to approximately 180 pages of documents in that Binder. The Government also seized two similar binders containing incident reports and patient complaints from the Sullivan and Farmington APCs ("the Sullivan Binder" and "the Farmington Binder"). Together these two binders contain 280 pages of *Bates*-stamped documents, which are numbered 565-844.

Pursuant to the Court's Order of July 28, 2013, the Government instituted a Taint Team and "Chinese Wall" process for review of the seized documents that Petitioners assert are protected by the attorney-client privilege and work product doctrine. *See* Doc. No. 10. The process involved designation of separate attorneys from the United States Attorney's office (the "Privilege Team") to review and address the privilege issues. The procedures assured that the Government attorneys involved in the investigation and prosecution would neither see nor discuss the documents at issue, and the Privilege Team would neither participate in nor discuss the prosecution. Assistant United States Attorney Howard J. Marcus was assigned as lead attorney on the Privilege Team.

A hearing was held on September 17, 2013, at which counsel for Petitioners and attorneys from the Privilege Team presented argument. Copies of the documents at issue were also provided to the Court for *in camera* review.

Following the Privilege Team's review of the 564 pages of *Bates*-stamped documents in the Festus Binder, the Government agreed to return 15 of those documents conceding that these documents constitute protected attorney work-product. The

Government also concedes that pages 554 through 560 of the Festus Binder should be returned to Petitioners as they are subject to the attorney-client privilege in light of their disclosure at one point, to counsel for Petitioners' insurance carrier.

## II.  Documents Claimed to be Privileged

### A.  Applicable Law

1.  Attorney-Client Privilege

"'[T]he common law–as interpreted by United States courts in light of reason and experience–governs [the claim of attorney-client privilege]" here.  Fed. R. Evid. 501; *see also United States v. Yielding*, 657 F.3d 688, 706 (8th Cir. 2011); *Baranski v. United States*, No. 4:11-CV-123 CAS, 2012 WL 425007, at *3 (E.D. Mo. Feb. 9, 2012).

The attorney-client privilege extends to confidential communications made for the purpose of facilitating the rendition of legal services to a client.  *See Yielding*, 657 F.3d at 707 (citing *United States v. Horvath*, 721 F.2d 557, 561 (8th Cir. 1984)).  "A communication is made for the purpose of obtaining or providing legal assistance . . . if it is made to or to assist a person . . . who is a lawyer or who the client or prospective client reasonably believes to be a lawyer . . . ." Restatement (Third) of the Law Governing Lawyers § 72(1) (2010).

Petitioners, as the holders of the privilege, bear the burden of demonstrating that the privilege is applicable to the documents at issue.  *See Hollins v Powell*, 773 F.2d 191, 196 (8th Cir. 1985).  The validity of any claim of attorney-client privilege turns on the existence of an attorney-client relationship.  *See Horvath*, 721 F.2d at 561 (stating that a communication will not be privileged unless it was "made for the purpose of facilitating

the rendition of legal services to the client").

### 2. Work Product Doctrine

"Historically, a lawyer's mental impressions, conclusions, opinions, and legal theories have been afforded substantial protection in order to secure the lawyer's effective advocacy and representation of his or her clients' interests." *In re Grand Jury Proceedings, G.S., F.S.*, 609 F.3d 909, 916 (8th Cir. 2010) (Bye, Circuit J., concurring in part and dissenting in part) (citation omitted). The work product doctrine restricts the access of an opponent to materials "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3); *see also Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (explaining that the work product doctrine applies to "materials obtained or prepared by an adversary's counsel with an eye toward litigation").

There are two types of work product, opinion and non-opinion or fact work product. *See In re Grand Jury Proceedings, G.S3and F.S.*, 609 F.3d at 913. Opinion work product "encompasses a lawyer's opinions, conclusions, mental impressions, and legal theories. . . ." *Id.* Non-opinion or fact work product is "raw data collected in the course of litigation and included in an attorney's file." *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). Regardless of the type of work product at issue, the threshold question governing application of the doctrine is whether the contested documents were prepared in anticipation of litigation. *Binks Mfg. Co. v. Nat'l-Presto Indus., Inc.*, 709 F.2d 1109, 1118 (8th Cir. 1983). The mere possibility that litigation may result is not sufficient to trigger the protection of the work product doctrine. *Id.* at 1119; *see also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977)

(holding that more than a remote prospect of future litigation is required to trigger work product protection). "[M]ore than a remote prospect" is required because

> [p]rudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

*Id.* (internal quotation omitted). Finally, as with claims of attorney client privilege, the parties claiming protection under the doctrine bear the burden of establishing the requisites for its application. *See Hickman*, 329 U. S. at 512.

**B. <u>Arguments of the Parties</u>**

At the hearing, Petitioners requested the return of the remaining 375 pages of documents from the Festus Binder and the 274 pages of documents in the Sullivan and Farmington Binders on the ground that they are protected by the attorney-client privilege or work product doctrine. Petitioners contend that the documents are privileged because an attorney had once advised them to create incident reports, in a format provided by that attorney, whenever there was an incident that might lead to litigation. The documents at issue are incident reports that were prepared by employees of APC regarding such matters as complaints by patients, incidents, such as a fall, regarding a patient, and employee disputes. Petitioners concede that no attorney ever saw or reviewed these documents, with the exception of pages 554 through 560, prior to the execution of the search warrant.

In response, the Government asserts that pages 1 through 553 and 561 through 564 of the *Bates*-stamped documents are not protected by the attorney-client privilege or work product doctrine because they are not associated with an attorney client relationship or were not prepared in anticipation of litigation. Rather, these documents are in-house reports related to employee and patient misconduct, the "firing" of patients, work-place accidents, patient complaints, and medical mistakes. The bulk of these documents are entitled "Advanced Pain Center Adverse Incident Report." Some of the forms appear to have been downloaded from the Internet and although some of them carry the label "Attorney Client Privileged Document Anticipation of Litigation," the Government contends the documents do fall within either privilege as they were not discussed with counsel nor specifically prepared at the direction of counsel in anticipation of litigation.

**C. Discussion**

Upon review of the parties' arguments, the affidavits and exhibits submitted by the parties at the hearing, and *in camera* review of the documents at issue, the Court concludes that none of the disputed documents are subject to the attorney-client privilege. In support of their claim of privilege, Petitioners assert that some years ago, in aftermath of other litigation, an attorney prepared a form incident report for them and advised Petitioners' Compliance Officer to complete the forms "in anticipation of litigation" and to use it to record incidents that might arise in the day-to-day operation of the practice. Notably, Petitioners do not assert that they have a present or continuing relationship with that attorney. In fact, it is undisputed that prior to the execution of the search warrant neither the completed Adverse Incident Reports, nor their contents had ever been

communicated to or reviewed by an attorney.  Finally, Petitioners apparent argument that the labeling of some of the documents as "Attorney-Client Privileged" renders those documents privileged is without merit.

In the absence of an existing attorney client relationship relating to the documents or a showing by Petitioners that the documents at issue were ever communicated to an attorney for purposes of obtaining legal advice, the Court cannot conclude that any of the disputed documents are subject to the attorney-client privilege.  *Hollins v Powell*, 773 F.2d at 196; *Horvath*, 721 F.2d at 561.  Petitioners do not contend, much less establish, that the forms were completed or reviewed by counsel.  *Hollins v Powell*, 773 F.2d at 196.  Nor have Petitioners asserted that the information on the forms at issue was ever discussed with any attorney.  In addition, it has long been established that the mere labeling of a document or the use of a form prepared by an attorney is not sufficient to convey the protection of the attorney-client privilege.  *See Hickman*, 329 U. S. at 512.

The Court further concludes that the contested documents are not subject to either variant of the work product doctrine.  Petitioners have not satisfied their burden to show that the documents were prepared by, or at the behest of, an attorney and in reasonable anticipation of litigation.  Petitioners' practice of marking each incident report with the phrase "Prepared in Anticipation of Litigation" does not magically convert the document to attorney work product.  Indeed, many of the reports were completed many years ago, and Petitioners cannot show any reasonable basis for claiming any litigation is anticipated with respect to these matters.

Petitioners' contention that the generic incident report forms are subject to the

work product doctrine because the form was prepared by an attorney also lacks merit. The record indicates that in the course of the operation of the APCs many different individuals including medical assistants, receptionists, compliance officers, and physicians filled out the forms in the wake of every day mishaps and incidents of many types. The very fact that the incident reports were used in so many different types of situations by personnel with varying qualifications strongly suggests that they were prepared as part of the day-to-day operation of the APCs and not in anticipation of litigation. *See Diversified Indus., Inc.*, 572 F.2d at 604 (holding that there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation); *Love v. Sears Roebuck and Co.*, No. 3-13-CV-402-S, 2014 WL1092270, at *2 (holding that incident reports were not prepared in anticipation of litigation where they were prepared as part of general policy to record incidents rather than specific concern about litigation). To the extent that the reports were completed in recognition of the mere possibility that the numerous types of incidents of varying degrees of severity might result in litigation, that possibility is not sufficient to warrant the application of the work product doctrine here. *Id.*

Accordingly, the Privilege Team shall return to Petitioner the fifteen documents the Government previously agreed to return, and the documents numbered 554-560, and shall not discuss the contents of these documents with anyone, including the attorneys and agents involved in the investigation and prosecution of the case. Except with respect to these documents, Petitioners' motion to return documents based on a claim of attorney-client or work privilege is denied.

## III. Copying Costs

### A. Applicable Law

Absent exceptional circumstances, the Government is not required to bear the costs of copying documents lawfully seized pursuant to a valid search warrant.[5] *See 225,1468 and 1470 Statler Towers, 197 Delaware Avenue v. United States (Statler Towers),* 787 F.2d 796, 799 (2d Cir. 1986) (citing Federal Rule of Criminal Procedure 16 and holding that "[a]bsent exceptional circumstances," a party who unsuccessfully moves before indictment for return of property seized under a warrant bears "the burden of duplicating costs");[6] *Delta Engr. v. U.S.,* 41 F.3d 259, 263 (6th Cir. 1994) (holding that the Government's refusal to pay for copying documents seized from an engineering business was "substantially justified" because Rule 41(g) does not require the government to bear copying costs).

Most federal courts considering the issue have refused to place responsibility on the Government for the costs of copying lawfully seized documents. *See, e.g., Bennett,* 2013 WL 3821625, at *8-9 (concluding that owner of seized documents who was not

---

[5] The Court has not found and the parties have not offered any Eighth Circuit case law addressing the issue of who must bear the cost of copying lawfully seized documents for use by the owner of the documents.

[6] The Second Circuit recognized that Rule 16 governs criminal discovery and does not apply to pre-indictment motions such brought under Rule 41(e). Nonetheless, the court noted that Rule 16 "provides a useful analogy" for resolving the issue of copying costs. The court further observed that in the discovery context, the clear import of Rule 16 is that the non-indigent criminal defendants must pay the cost of copying documents legally held by the government. Thus the court concluded "[t]here is no reason not to follow the same general rule in the context of a failed pre-indictment challenge to the validity of a seizure." *Id.* at 798.

indigent and had not demonstrated that bearing the costs of duplicating the seized documents would be an "undue hardship" must do so at his own expense); *55 W. 47th St., Suites 620 & 650 v. United States*, 712 F. Supp. 437, 441 (S.D.N.Y. 1989) (stating with regard to seized documents that "Rule 41[(g)] mandates that the Government either return or retain property; it does not obligate the Government to furnish copies of the seized property, much less to pay for such copying.") (citation omitted); *6600 Long Island Expressway, Suites 104 & 105,* No. 88–0906 M, 1988 WL 142662, at *2 (E.D.N.Y. Dec. 28, 1988) (finding that the Government was not required to pay the expense of copying documents seized from a marketing company because it was "under no legal obligation to return the documents" and the document owner had not demonstrated any "extraordinary circumstances which would shift the burden of this expense to the United States").

Courts have identified, however, certain factors that, in combination, constitute "exceptional circumstances" justifying an award of copying costs to the owner of seized documents.  For example, the court in *In re Search Warrants Concerning Nat'l Ins. Consultants Inc. (Nat'l Ins. Consultants)*, 139 F.R.D. 684 (D. Colo. 1991), observed that the following factors were present in that case.

> First, there [was] no indication that an on-going grand jury investigation [was] in progress.  Second, the affidavit remain[ed] sealed, and the real parties [were] at a disadvantage in seeking return of the original documents.  Third, the property seized [had] been moved to Kansas City, some four hundred and fifty miles from [the] Court and the real parties in interest.  Fourth, no grand jury indictment [had] been returned or is anticipated within a reasonable period of time, as so stated by counsel for the Government.  Fifth, there [was] no dispute that the files of clients are necessary for payment of medical claims under the plans.  Sixth, there [had] been no determination made that the property seized should not be returned.

Seventh, almost four months [had] elapsed since the seizure of the items and no indictment has been returned.

*Id.* at 687.

After recognizing the general rule set forth in *Statler Towers*, that the government should not bear the cost of copying seized documents, the court held that the factors set out above gave rise to "exceptional circumstances" justifying an award of costs to the defendants in that case. *See id.* The court relied heavily on the fact that the government had stored the seized documents at a location some 450 miles away from defendants and found that this circumstance imposed an additional "substantial cost of transport for the . . . parties to inspect the files and insure that copies [were] complete." *Id.* Therefore, the court concluded that imposing travel and copying costs on defendants was "inequitable" and a significant departure from the "equities" present in *Statler Towers*. *Id.*

The court also noted that at the time of the request, a grand jury indictment had not issued, no ruling had issued with respect to the return of the files and the search warrant affidavit remained under seal, which made it more difficult for the defendants to pursue return of the property. *Id.* Finally, the court reasoned that the government rather than the defendants had chosen "to undertake a criminal investigation rather than utilizing civil remedies, such as injunction, to close the [defendants'] business" and that lack of access to the documents would harm both the defendants and their clients. *Id.*

## B. Discussion

Petitioners contend that exceptional circumstances justify an order requiring the Government to bear those copying costs which totaled $9,579.15 at the time this motion

was filed. Doc. No. 18-1. Petitioners assert that the factors identified in *Nat. Ins. Consultants* are present in this case and give rise to exceptional circumstances justifying an award of copying costs to Petitioners. Having reviewed those factors and the circumstances of this case, the Court concludes that *Nat'l. Ins. Consultants* is distinguishable from this case in several respects. Therefore, the Court finds no reason to depart from the general rule that the Government does not bear the costs of copying seized documents.

Specifically, in this case, unlike *Nat'l Ins. Consultants*, the Government asserts that there is an ongoing grand jury investigation, which began prior to the execution of the search warrant. In addition, the search of the clinics took place only six weeks, rather than four months, before the filing of this motion. At that juncture, the Government had not had sufficient time to review the seized documents and its continued need for the documents as well as the absence of an indictment were reasonable. Perhaps most importantly, the patient files in this case were stored and available for inspection in the City of Saint Louis in close proximity to Dr. Naushad's residence and the offices of his attorneys. Moreover, Petitioners do not assert and there is no indication that they are indigent or that any unusual financial circumstances warrant an exception to the general rule regarding copying costs.

Finally, at the time of the court's opinion in *Nat'l Ins. Consultants* the search warrant affidavit remained under seal and the court had not ruled with respect to the request for return of the seized documents. In this case, however, the Court has denied the Petitioners' request for a preliminary injunction mandating return of the patient files

and Petitioners have been given a redacted copy of the sealed search warrant affidavit. Petitioners are not disadvantaged with respect to their Rule 41(g) motion because, unlike the defendants in *Nat'l. Ins. Consultants*, they had access to the information necessary to pursue their arguments concerning return of the documents and the validity and proper execution of the search warrant. On the basis of the foregoing, the Court concludes that the factors identified in *Nat'l Ins. Consultants* are not present here.

Nonetheless, the Court concludes that one aspect of the circumstances here justifies shifting responsibility to the Government for a minor portion of the copying costs, attributable to expediting the copying of the first group of documents. At the time the Government executed the search warrants, it knew that it was seizing patient files from active medical facilities, and could reasonably anticipate that APC would need to have access to some significant number of files for patient treatment. Although the Government was not unreasonable in refusing simply to return the files to Petitioners for copying, it also had not put any arrangements in place for it to copy those files within the time frame required for continued treatment and care of APC patients. The effect on patients–third parties in no way responsible for the alleged criminal activity–of the delay in copying should have been given greater consideration.

The Court finds that the Government did not act in bad faith. Nevertheless, the Government's failure to make arrangements with a copy service at or near the time the search warrants were executed placed Petitioners in the position of having to arrange to have a portion of the first group of documents—needed for immediate patient care— copied on an *expedited* basis. And the Court believes it would be unfair to require

Petitioners to bear this additional portion of the copying costs. The documentation Petitioners submitted does not indicate a breakout of the copying expenses, but the Court estimates the cost of expediting the copying of these files at $750.00 and will award that amount to Petitioners. *See* Doc. No. 18-1.

Finally, although they do not tie their argument to the legal authority they cite, Petitioners assert the Government's conduct with respect to the production of the seized patient files and retention of a copy service to copy or scan the seized documents was dilatory and dishonest. Upon review of the record, the DEA affidavit, and the circumstances related to the scanning and copying processes, the Court finds no basis to conclude that the Government purposefully engaged in delaying tactics or failed to act in good faith. Further, the Court notes that Petitioners also contributed to the delay by their own positions prior to and during the early portion of the Court's involvement.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioners' motion for an order requiring the return of certain seized documents on the ground that they are protected under the attorney-client privilege and work product doctrines is **DENIED**. (Doc. No. 1.)

**IT IS FURTHER ORDERED** that Petitioners' motion to recover copying costs (Doc. No. 18) is **GRANTED in part** and **DENIED in part** as follows:

a) the Government shall reimburse Petitioners for $750.00 of the copying costs they incurred, and

b) Petitioners shall bear the remainder of the requested copying costs.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2014.